UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

    v.                                    Case No. 23-CR-185

RENO J. CONTRERAS,

          Defendant.

# RECOMMENDATION AND ORDER

Reno J. Contreras is charged with possessing controlled substances with intent to distribute them, possessing a firearm in furtherance of a drug trafficking crime, and possessing two firearms after having been convicted of a felony. (ECF No. 16.) He argues that prohibiting him from possessing a firearm because of his prior felony conviction violates the Second Amendment. Therefore, he moves to dismiss count three of the indictment.

This court recently addressed this question in *United States v. Neal*, 23-CR-141, ECF No. 15 (E.D. Wis.). The court largely restates its prior analysis.

In a series of decisions, the consequences of which courts are still struggling to sort through, the Supreme Court upended understanding of the Second Amendment.

No longer is gun ownership a right connected to service in a state militia, *see United States v. Miller*, 307 U.S. 174, 178 (1939), but rather it is an individual right, *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The individual right to own a gun is incorporated into the Fourteenth Amendment's guarantee of Due Process, and thus the Second Amendment limits both state and federal efforts to regulate guns. *McDonald v. City of Chi.*, 561 U.S. 742, 750 (2010). And unlike other constitutional rights, *cf.*, *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938), rather than determining whether a restriction on gun possession serves a compelling government interest in light of the serious problems posed by guns today, *see, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019), restrictions must be viewed in terms of how the right to keep and bear arms was understood at the time the Second Amendment was adopted, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

The Court in *Bruen* held that this translates into a burden on the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Several years before *Bruen* the Court stated that certain restrictions, including a ban on felons possessing firearms, are "presumptively lawful." *Heller*, 554 U.S. at 626-27 and fn. 26; *see also McDonald*, 561 U.S. at 786. Justice Kavanaugh, in a concurrence joined by Chief Justice Roberts, reiterated this point in the Court's six to three *Bruen* decision. *Bruen*, 142 S. Ct. at 2162. Similarly, in his own concurrence in *Bruen*, Justice Alito stated, "Nor have we disturbed anything

that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring) (internal citation omitted)

If a presumption applies, it is normally the other side's burden to rebut it. *See, e.g.*, Presumption, Black's Law Dictionary (11th ed. 2019); Kenneth S. Broun, et al. McCormick on Evidence § 342 Presumptions in General 724-26 (Robert P. Mosteller ed., 8th ed. 2020). However, it is debatable whether the Court in *Heller* intended to create a legal presumption or if it was using the term more colloquially.

Historical analysis requires more than simply looking through a few old documents and seeing what they say. It "sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring)). The task is "often exceedingly difficult." Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cinn. L. Rev. 849, 856 (1989). It "requires the consideration of an enormous mass of material," "an evaluation of the reliability of that material," "immersing oneself in the political and intellectual atmosphere of the time," and "placing out of mind knowledge that we have which an earlier age did not." *Id.* at 856-57. "It is, in short, a task sometimes better suited to the historian than the lawyer." *Id.* at 857; *see also* Shawn Hubler, *In the Gun Law Fights of 2023, a Need for Experts on the Weapons of 1791*, N.Y. Times (March 14, 2023), available at https://nyti.ms/402xCjd.

Few judges, however, are historians. They lack the time and resources, not to mention the skills, to be able to determine the mindset of the populace in the founding era. One of the best starting points for discerning how the Constitution was understood in the founding era is the records of the state ratifying conventions. The Center for the Study of the American Constitution has compiled *The Documentary History of the Ratification of the Constitution*, a record that, to date, spans 29 volumes and more than 15,000 pages. The University of Wisconsin Libraries has made navigation of this immense collection more manageable by digitizing it, *see* https://search.library.wisc.edu/digital/AConstitution, but even keyword searches often yield more material than a trial court can adequately review, much less assess for nuance and context.

For example, a search for "arms" and its variants yields more than 1,200 results. A search for "disarm" yields the much more manageable total of 68 documents, but few relate to the disarmament of citizens generally, instead addressing concerns about the federal government disarming state militias. *See, e.g.*, *The Documentary History of the Ratification of the Constitution*, Vol. 33, Ratification of the Constitution by the States: Pennsylvania, Supplemental Documents, Pennsylvania Gazette, 20 February 1788, p. 912 https://asset.library.wisc.edu/1711.dl/HHHGBNLX4FRPQ85/R/file-132ce.pdf#page=470 (responding to the concern of disarmament reflected in The Dissent of the Minority of the Convention: "Congress have no power to disarm the militia. Their swords, and every

4
Case 2:23-cr-00185-JPS-WED   Filed 04/01/24   Page 4 of 17   Document 30

other terrible implement of the soldier, are the birth-right of an American. What clause in the state or federal constitutions hath given away that important right."). Comments regarding concerns that Congress will disarm militias are not particularly helpful in determining the meaning of the Second Amendment in light of the Supreme Court having held that, at the time of its adoption, the amendment was understood as being disconnected from military service. *Heller*, 554 U.S. at 585.

"Even if courts were capable of comprehensively surveying the historical evidence, it would not necessarily reveal a clear answer to a constitutional question." *United States v. Now*, No. 22-CR-150, 2023 U.S. Dist. LEXIS 58087, at *12 (E.D. Wis. Mar. 15, 2023). Then, as today, opinions about the meaning of the constitution differed, often radically. *See, e.g.*, *id.* (discussing conflicting views of the First Amendment as reflected by contemporaneous criticism of the Alien and Sedition Acts). There was no single, universal founding era understanding of the right to bear arms, as evidenced by the variety of proposals to codify the right. *See Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 713). In addition to the text that became the Second Amendment, there were at least three similar contemporaneous proposals. The earliest, attributable to Robert Whitehill at the Pennsylvania convention, "proposed that the people should have a right to bear arms 'unless for crimes committed, or real danger of public injury from individuals.'" *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (quoting 2 Bernard

Schwartz, *The Bill of Rights: A Documentary History* 665 (1971)); *see also The Documentary History of the Ratification of the Constitution*, Vol. 2, Ratification of the Constitution by the States: Pennsylvania, Sec. 22. A. Proceedings and Debates on the Convention, Motion of Robert Whitehill pp. 597-98, https://search.library.wisc.edu/digital/ATR2WPX6L3UFLH8I/pages/AHEXEUY72EUD3G9C, ("That the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals …."); *id*., Sec. 23. B. The Dissent of the Minority of the Convention, pp. 623-24, https://search.library.wisc.edu/digital/ATR2WPX6L3UFLH8I/pages/A5H6DA44GDWQ5Y8M; *id*. Vol. 15 Commentaries on the Constitution, Sec. 12. Commentaries on the Constitution: Public and Private, p. 19, https://search.library.wisc.edu/digital/ATR2WPX6L3UFLH8I/pages/ABGUF47XAF3LDP82.

Another, introduced by Samuel Adams at the Massachusetts ratifying convention, limited the right to keep arms to "peaceable citizens." *Kanter*, 919 F.3d at 454-55 (Barrett, J., dissenting) (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 675, 681 (1971)); *see also The Documentary History of the Ratification of the Constitution*, Vol. 6. Ratification of the Constitution by the States: Massachusetts, Sec. 14. V. The Massachusetts Convention, Convention Journal, 6 February 1788, p. 1453, https://search.library.wisc.edu/digital/ATR2WPX6L3UFLH8I/pages/A4PPESYGJBR5EU

6
Case 2:23-cr-00185-JPS-WED   Filed 04/01/24   Page 6 of 17   Document 30

8P (noting Samuel Adams's proposal "that the said Constitution shall never be construed to authorize Congress … to prevent the people of the United States, who are peaceable citizens, from keeping their own arms"); *id.*, Vol. 7, Ratification of the Constitution by the States: Massachusetts, Sec. 14. V. The Massachusetts Convention: Commentaries Public and Private 3 January-4 March 1788, p. 1583, Letter from Jeremy Belknap to Ebenezer Hazard, 10 February 1788, https://search.library.wisc.edu/digital/ATR2WPX6L3UFLH8I/pages/ACNNLTYQ3WOTVN8S (commenting on Samuel Adams's introduction of "an amendment of his own fabrication" that, among other things, guaranteed "the right of peaceable citizens to bear arms").

A third was even more expansive (and restrictive of Congressional power) than the eventual Second Amendment when it stated, "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (quoting 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891)); *see also The Documentary History of the Ratification of the Constitution*, Vol. 18, Commentaries on the Constitution: Public and Private, Volume 6: 10 May to 13 September 1788, Sec. 12, Commentaries on the Constitution: Public and Private, p. 188, https://search.library.wisc.edu/digital/ATR2WPX6L3UFLH8I/pages/ADVWZLZFTF3MV28M; *id*. Vol. 28, Ratification of the Constitution by the States: New Hampshire,

Convention Proceedings, 20 June 1788, p. 373, https://asset.library.wisc.edu/1711.dl/ IBNMSX3DKM3V38U/R/file-2b3df.pdf#page=461.

Views also changed over time. "The Court therefore cautioned against giving too much weight to laws passed before or after the Founding, although a 'long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice.'" *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2136).

Even the "founding era" cannot be viewed as a monolithic period in terms of social and political attitudes. In much the same way that no one would presume that popular attitudes in 1975 reflect popular attitudes in 1991, caution must be exercised before presuming that there was cultural stasis between 1775 and 1791. Views can change with the passage of time, sometimes even short periods of time.

Judges and lawyers are naturally inclined to look to laws (as opposed to the wide variety of other sources that historians typically rely on) when attempting to answer questions of history. Pre-founding era laws are suspect because they may be precisely the laws that the founders intended to break from with the Second Amendment. Looking only to laws on the books in 1791 to understand the meaning of a phrase like "the right to keep and bear arms" or the scope of the Second Amendment can yield an incomplete picture. Laws have never represented a complete view of a society's norms, mores, or attitudes, and this was especially true in the 18th century, when criminal laws

were less comprehensive than they are today. *Cf. United States v. Kelly*, No. 3:22-cr-00037, 2022 U.S. Dist. LEXIS 215189, at *5-6 (M.D. Tenn. Nov. 16, 2022) ("No reasonable person would, for example, think that the legislatures of today have adopted every single hypothetical law capable of comporting with our understanding of the Constitution, such that any law that has not yet been passed simply must be unconstitutional.").

The absence of a law relating to a particular issue could suggest that the legislature believed that such a law would violate an inherent right, but it could just as likely reflect political considerations, views about the role of government, perceptions of the seriousness of the problem the law would address, practical considerations regarding the enforceability of the law, or a myriad of other things.

Because the Second Amendment initially applied only to the federal government, state laws of the founding era can provide insight into the understanding of the Second Amendment only insofar as state constitutions codified similar guarantees or it can be said that legislatures believed there existed an inherent right to keep and bear arms that transcended state constitutions. *Now*, 2023 U.S. Dist. LEXIS 58087, at *15. But, again, as is reflected in the competing proposals for what eventually became the Second Amendment, or in parallel state constitutional provisions in effect at the time, *see* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. Law & Pol. 191, 208, there was significant disagreement as to the scope of any inherent right to bear arms.

9
Case 2:23-cr-00185-JPS-WED   Filed 04/01/24   Page 9 of 17   Document 30

It was not until the early 20th century that the federal government began to significantly regulate firearms. *See* National Firearms Act, 48 Stat. 1236; Federal Firearms Act, Pub. L. 75-850, 52 Stat. 1250, 1251. But rather than suggesting that such regulations were previously seen as inconsistent with the Second Amendment, the century of inaction is likely more reflective of the limited role the federal government played in law enforcement prior to the New Deal.

Firearm crimes undoubtedly existed in the founding era. Presumably some of those offenses were committed by persons who previously had been convicted of serious crimes. But there is no basis for concluding that firearm crimes existed as "a general societal problem" such that "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. An age where pistols were unheard of and firearms were generally limited to large, slow-loading, imprecise, and relatively short-ranged muskets is vastly different from the United States today, where easily concealable revolvers or semiautomatic pistols are ubiquitous and rifles or carbines that can accurately fire dozens of high-powered rounds in a few seconds are readily available. "Today, firearm-related violence is frequently referred to as an 'epidemic.'" *Now*, 2023 U.S. Dist. LEXIS 58087, at *14 (citing *See, e.g.*, Deidre McPhillip, CNN, *America's gun epidemic is deadlier than ever, and there are vast disparities in who's dying*, (Nov. 29, 2022) available at https://www.cnn.com/2022/11/29/health/gun-

10
Case 2:23-cr-00185-JPS-WED   Filed 04/01/24   Page 10 of 17   Document 30

deaths-disparities/index.html; Phil B. Fontanarosa and Kirsten Bibbins-Domingo, JAMA, Editorial: The Unrelenting Epidemic of Firearm Violence, (Nov. 27, 2022) available at https://jamanetwork.com/journals/jama/fullarticle/2796714; *see also Bruen*, 142 S. Ct. at 2164-67 (Breyer, J., dissenting) (outlining current data regarding firearm violence in the United States)).

"[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010)). Consistent with the court of appeals' summary of the historical record, the Court in *Bruen* repeatedly underscored that "the people" to whom the right "to keep and bear Arms" under the Second Amendment applies consists of "law-abiding citizen[s]." *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2155. While some have dismissed these statements as mere dicta, *see Range v. AG United States*, 69 F.4th 96, 101-03 (3d Cir. 2023), it is hard to so quickly dismiss a qualification that the Court employed 11 times in its decision in *Bruen* (and three times in *Heller*).[1] Ultimately, whether unvirtuous citizens are outside the scope of "the people" to whom the Second Amendment applies, or are

---

[1] In a post-*Heller* decision, the Court of Appeals for the Seventh Circuit stated that the Court's references to law-abiding citizens "did not reflect an attempt to define the term 'people.'" *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015). It continued, "We are reluctant to place more weight on these passing references than the Court itself did." *Id.* The fact that the Court in *Bruen*, undoubtedly mindful of the confusion that its use of "law-abiding citizens" in *Heller* generated, chose to not only repeat the phrase but use it 11 times merits reconsideration of whether these really were merely "passing references" that are easily discounted.

merely a class of persons whose rights under the Second Amendment may be curtailed by the legislature, *see Kanter*, 919 F.3d at 452-53 (Barrett, J., dissenting), the result is the same, *id.* at 452.

Finding that the history and tradition of the Second Amendment supports disarming the unvirtuous begs the question of how the "unvirtuous" are identified. If a legislature can disarm any group by designating them unvirtuous, the Second Amendment may be seen as a hollow right. But if firearm possession was historically regarded as being subject to legislative determinations of virtuousness, then a court closely scrutinizing a legislative decision would itself be inconsistent with the history and tradition of the right to bear arms.

If dispossession were limited to groups regarded as unvirtuous at the time of the founding, then racial, ethnic, political, and religious minorities could be prohibited from possessing firearms (at least under the Second Amendment), *see Jackson*, 69 F.4th at 502, while the mentally ill, a category that generally did not exist in 1791, *Now*, 2023 U.S. Dist. LEXIS 58087, at *14 (citing Adam Winkler, *Gunfight* 287 (2011))), could not, even though the Court identified firearm restrictions regarding the mentally ill as "presumptively lawful," *Heller*, 554 U.S. at 626-27 and fn. 26.

And while some have argued that "dangerous" is more consistent with the historical record than "unvirtuous," *see Kanter*, 919 F.3d at 451 (Barrett, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from*

12
Case 2:23-cr-00185-JPS-WED    Filed 04/01/24    Page 12 of 17    Document 30

merely a class of persons whose rights under the Second Amendment may be curtailed by the legislature, *see Kanter*, 919 F.3d at 452-53 (Barrett, J., dissenting), the result is the same, *id.* at 452.

Finding that the history and tradition of the Second Amendment supports disarming the unvirtuous begs the question of how the "unvirtuous" are identified. If a legislature can disarm any group by designating them unvirtuous, the Second Amendment may be seen as a hollow right. But if firearm possession was historically regarded as being subject to legislative determinations of virtuousness, then a court closely scrutinizing a legislative decision would itself be inconsistent with the history and tradition of the right to bear arms.

If dispossession were limited to groups regarded as unvirtuous at the time of the founding, then racial, ethnic, political, and religious minorities could be prohibited from possessing firearms (at least under the Second Amendment), *see Jackson*, 69 F.4th at 502, while the mentally ill, a category that generally did not exist in 1791, *Now*, 2023 U.S. Dist. LEXIS 58087, at *14 (citing Adam Winkler, *Gunfight* 287 (2011))), could not, even though the Court identified firearm restrictions regarding the mentally ill as "presumptively lawful," *Heller*, 554 U.S. at 626-27 and fn. 26.

And while some have argued that "dangerous" is more consistent with the historical record than "unvirtuous," *see Kanter*, 919 F.3d at 451 (Barrett, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from*

*Possessing Firearms*, 20 Wyo. L. Rev. 249, 275-85 (2020), an historic tradition of disarming only the dangerous would still support the constitutionality of a law disarming all[2] felons. The legislature may appropriately conclude that the danger arises not from the nature of the convicted offense but the individual's willingness to commit a serious violation of the law. *Cf. Jackson*, 69 F.4th at 505 ("Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons.").

The fact that the prohibition may persist for life, again, is not inconsistent with history. Legislatures have on occasion chosen to make dispossession temporary—that is, after a period of time the felon can legally possess a firearm. *See* Greenlee, 20 Wyo. L. Rev. at 268-69. But that does not necessarily reflect the limits of the Second Amendment. Legislatures may choose to narrow the scope of their dispossession laws or provide judicial means for expunging convictions or restoring felons' right to possess firearms. But the history and tradition of the Second Amendment does not require that dispossession be temporary.

---

[2] The federal felon dispossession statute is often said to ban all felons from possessing a firearm. The statute has a narrow exception for "any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20).

A lifetime ban on felons possessing firearms is consistent with history and tradition, particularly when it is remembered that, at the time of the founding, felonies could be punished with death.[3] Granted, execution may have been employed sparingly in the colonial era, *Kanter*, 919 F.3d at 459 (quoting Lawrence M. Friedman, Crime and Punishment in American History 42 (1993)), in part because of the need for labor, Friedman, *Crime and Punishment in American History* 48. In fact, the post-revolutionary period was an era of criminal justice reform that included efforts to limit the application of the death penalty. Friedman, *Crime and Punishment in American History* 63, 73.

But in determining the limits of constitutional power what matters is not the power that was exercised at the founding but the power that history demonstrates founding era officials possessed. Governments in the founding era undoubtedly had the authority to punish serious crimes or incorrigible criminals with death. Moreover, even without the legislature creating a means for relief, no dispossession statute is truly permanent. In much the same way that the pardon power was frequently employed in the colonial and founding eras to render executions uncommon, Friedman, *Crime and Punishment in American History* 42, the executive today retains the power to restore a

---

[3] Aside from execution, there was the punishment of "civil death," which constituted an extinguishment of all the rights of the offender. *See Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (discussing Harry David Saunders, Note, *Civil Death—A New Look at an Ancient Doctrine*, 11 Wm. & Mary L. Rev. 988, 988-89 (1970); Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Incarceration*, 160 U. Pa. L. Rev. 1789, 1797 (2012)).

felon's right to bear arms. Whether to exercise the power is the prerogative of the executive, outside the purview of courts or legislatures.

Criticism that today seemingly minor offenses are categorized as felonies, Greenlee, 20 Wyo. L. Rev. at 269, is more properly a criticism of the policy of over-criminalization than a basis for a constitutional challenge to felon dispossession laws. In only the most extreme of instances may a court find that a legislature's chosen punishment for a crime exceeds the bounds of the constitution. *See Lockyer v. Andrade*, 538 U.S. 63, 73 (2003). In any event, harsh penalties for serious crimes are not inconsistent with history. At the time of the founding, comparatively minor offenses were felonies (and punishable by death). *See* Laurence H. Tribe, *An Ounce of Detention: Preventive Justice in the World of John Mitchell*, 56 Va. L. Rev. 371, 377 (1970) (noting that a theft of $50 was a federal offense punishable by death at the time of the founding).

Even if the court were to conclude that dangerousness is a question that must be decided on a case-by-case basis, it would not benefit Contreras. Unlike the plaintiff in *Range*, Contreras cannot say that he was "convicted of a nonviolent, non-dangerous misdemeanor and had not been incarcerated." *Range*, 69 F.4th at 99.

It cannot be said that Contreras was never convicted of a dangerous offense. Contreras's criminal record dates back to 1996 when he was 20 years old and was sentenced to prison for illegal possession of a firearm. (ECF No. 6 at 4.) In 2002 he was charged with drug offenses that put him in prison for five years after his probation was

revoked following a felony conviction for false imprisonment. (ECF No. 6 at 5.) He was eventually discharged from extended supervision in March 2019. (ECF No. 6 at 5.) Drug dealing and false imprisonment (which was amended from second-degree sexual assault pursuant to a plea agreement) are serious and dangerous offenses. Nor are the convictions remote in time. Contreras completed his sentences roughly five years ago.

Therefore, for the reasons set forth in *United States v. Watson*, No. 23-CR-109, 2023 U.S. Dist. LEXIS 182631 (E.D. Wis. Oct. 11, 2023) (Griesbach, D.J.); *United States v. Neal*, 23-CR-141, ECF No. 15 (Oct. 17, 2023, E.D. Wis.) (Duffin, M.J.), *United States v. Denruyter*, No. 23-CR-155, 2023 U.S. Dist. LEXIS 209398 (E.D. Wis. Oct. 17, 2023) (Joseph, M.J.), *recommendation adopted United States v. Denruyter*, No. 23-CR-155, 2023 U.S. Dist. LEXIS 208265 (E.D. Wis. Nov. 21, 2023) (Griesbach, D.J.), *United States v. Johnson*, No. 22-CR-254, 2023 U.S. Dist. LEXIS 197650 (E.D. Wis. Nov. 3, 2023) (Adelman, D.J.), and *United States v. Davis*, No. 22-CR-210-JPS, 2024 U.S. Dist. LEXIS 22134, at *14-15 (E.D. Wis. Feb. 8, 2024), the court will recommend that Contreras's motion to dismiss be denied.

**IT IS THEREFORE RECOMMENDED** that Contreras's motion to dismiss count three of the indictment (ECF No. 25) be **denied**.

**IT IS FURTHER ORDERED** that, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), any written objection to any recommendation herein or part thereof shall be filed within fourteen days of service of this recommendation or

prior to the Final Pretrial Conference, whichever is earlier. Failure to timely object waives a party's right to review.

Dated at Milwaukee, Wisconsin this 1st day of April, 2024.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge